527 F.Supp. 869 (1981)
UNITED INDUSTRIAL SYNDICATE, INC., Plaintiff,
v.
WESTERN AUTO SUPPLY CO., Defendant.
No. 80-497C(1).
United States District Court, E. D. Missouri, E. D.
December 1, 1981.
*870 Peter W. Herzog, Jr., Thomas Lay Burroughs, St. Louis, Mo., for plaintiff.
Robert S. Allen, St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, Chief Judge.
This matter is before the Court upon defendant's motion for summary judgment against plaintiff's six count complaint. For reasons explained below, defendant's motion will be granted as to all counts.

*871 PARTIES
Defendant Western Auto, a Kansas City based company, sells at retail automotive products and other goods including household appliances. Western Auto sells its products through its own U.S. stores which are dealer operated. Prior to March 31, 1980, Western Auto inventory included a line of gas and electric ranges produced by Eagle which were privately labeled "Citation" or "Wizard". During this period, defendant purchased the majority of its stove inventory from plaintiff Eagle.
In March, 1980, Eagle was one of approximately twenty eight operating divisions of United Industrial Syndicate, Inc. (hereinafter U.I.S.), a New York conglomerate. The ranges Eagle produced for Western Auto were made in Eagle's Belleville, Illinois plant. Eagle also produced ranges for other customers and marketed ranges called "Eagle" or "Duchess" for sale through hardware distributors and manufacturer's representatives. Eagle did not manufacture micro wave ranges, although Western Auto did market micro wave ranges.

FACTS
In the early 1960's, Elmer Vocke purchased Eagle. Mr. Vocke ran Eagle until his death in November, 1977. During his tenure at Eagle, Vocke entered into oral agreements with various employees at Western Auto which provided that Eagle would give Western Auto six months' notice of any cutoff in the supply of ranges and in return Western Auto would give Eagle the same notice. The Western Auto employees who were privy to this oral agreement had left Western Auto employment by August, 1979.
Prior to August, 1979, Western Auto purchased its stoves from Eagle on a blanket purchase order basis. These blanket purchase orders would stipulate Western Auto range needs for three months from Eagle. After a 1978 management change at Western Auto, the sale of stoves was deemphasized at Western Auto. Plaintiff was aware of this change in emphasis. Moreover, the volume of business between plaintiff and defendant significantly declined in 1979. By August, 1979, Western Auto utilized specific purchase orders for quantities of stoves desired from plaintiff. Eagle would manufacture the number of ranges desired by defendant and then ship the ranges to defendant. The only ongoing agreement regulating the parties' relations was a factory agreement which set forth the rights of the parties on such subjects as service, warranties and parts.
Mr. Vocke's death exacerbated the financial difficulty which Eagle was experiencing. Vocke had continued to run Eagle after Harry Lebensfeld, U.I.S.'s sole stockholder, purchased Eagle. U.I.S. ultimately purchased Eagle from Lebensfeld in May, 1979. Eagle incurred losses each and every month during 1979 and into March, 1980.[1] An aborted sale of Eagle to Araque Management Company was nixed after Araque reviewed Eagle's financial performance during this period. Other offers to purchase Eagle were solicited but there were none forthcoming. Eagle refrained from branching out into new businesses for fear that expansion would detract from U.I.S. efforts to unload Eagle.
By Fall, 1979, Western Auto began to explore the possibility of changing stove suppliers. Western Auto had never purchased micro wave or convection stoves from plaintiff because Eagle did not make those types of ranges. Defendant had received numerous complaints, known to Eagle, concerning the poor quality of stoves distributed by Eagle to Western Auto. On March 31, 1980, Western Auto formally notified Eagle that it would begin purchasing all ranges and stoves from Tappan and merchandise them with the "Tappan" name. All ranges which Eagle had manufactured pursuant to an outstanding purchase order from Western Auto were purchased by defendant. These ranges were the subject of *872 a close-out sale by defendant. The remainder of Eagle inventory purchased by Western Auto, which could not be sold by Western Auto, was sold to Arthur Newman of Milwaukee, Wisconsin. Newman sold these ranges without either a Western Auto or a Eagle label but as Citation stoves.
After Western Auto terminated its stove buying arrangement with Eagle, plaintiff looked to Peerless Manufacturing Company as a possible purchaser of the entire Eagle operation. Peerless was located next door to Eagle and it had business contacts with plaintiff. In November of 1980, Eagle negotiated a deal with Peerless to buy Eagle's business. Eagle actually closed its stores on December 19, 1980. The former contract of sale between Peerless and Eagle was consummated in February, 1981. Peerless gave Eagle Six Hundred and Ninety Nine Thousand Dollars ($699,000) for certain of Eagle's assets with an option to purchase Six Hundred Fifty Thousand Dollars ($650,000) worth of inventory at fifty per cent (50%). Eagle sold its presses to Municipal Tool for the sum of Three Hundred Fifty Five Thousand Dollars ($355,000). A Chicago firm was engaged to sell Eagle's finished inventory estimated to be worth Three Hundred Thousand Dollars ($300,000).
Before discussing the merits of defendant's summary judgment motion, the Court notes that it has been guided by the Supreme Court's teaching that:
It is axiomatic that a complaint should not be dismissed unless `it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief'".
McLain v. Real Estate Board of New Orleans, Inc., 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). Furthermore, plaintiff's case has been given the benefit of all favorable inferences that might be reasonably made from the evidence. See e.g., Roberts v. Browning, 610 F.2d 528, 531 (8th Cir. 1979); McMahon v. Meredith Corp., 595 F.2d 433, 438 (8th Cir. 1979). Summary judgment is a radical device and should be granted circumspectively by the trial court.

COUNT ONE
In Count 1, plaintiff alleges defendant breached its contractual duty to provide a six month notice of termination of their buyer/seller arrangement, and as a result, defendant is necessarily required to buy a full six month requirement of ranges from plaintiff. The central issue involved in Count 1 is whether the oral contract between the parties, in which each promised to give the other six months' notice of termination, was a contract for the purchase and sale of goods which must be in writing to be enforceable. There is no question that ranges are "goods" within the meaning of the Uniform Commercial Code. See §§ 400.2-105; 400.2-106 (RSMo 1978).
To resolve the issue presented by Count 1, the Court must discern whether the predominate character and purpose of the oral agreement was that of a contract for the sale of goods. Bonebrake v. Cox, 499 F.2d 951 (8th Cir. 1974). The oral contract in question was obviously fashioned to insure a steady inventory for defendant and an adequate demand for plaintiff's stoves. Plaintiff argues "the subject matter and objective of such agreement is totally independent of the particular nature of goods or services manifested by that relationship." (Plaintiff's memo in opposition to defendant's motion for summary judgment at 15.) In support of that proposition, plaintiff has cited cases which purportedly deal with contracts that implicitly provided for the sale of goods to some extent, but nevertheless were held not to be contracts for the sale of goods. Upon careful examination, the cases reveal facts involving a contract for the sale of goods intertwined with a contract to perform services. See Prince v. Spire Corp., 584 S.W.2d 108 (Mo.App.1979); Robertson v. Ceola, 255 Ark. 703, 501 S.W.2d 764 (1973); Stagner v. Staples, 427 S.W.2d 763 (Mo.App.1968). These facts are inapposite to the case at bar. On the other hand, pre-code cases, which the Court is empowered to consult when not displaced by the code, indicate that contracts for the purchase and sale of goods not yet manufactured have been held to be contracts for the *873 sale of goods. See Krippendorf-Dittman Co. v. Hunt-Riddick Mercantile Co., 190 S.W. 44 (Mo.App.1916). The purpose behind a contract requiring prior notice of termination is inextricably bound with the overriding relationship between the parties which, in this case, was that of buyer and seller of stoves. The Court is of the opinion that, reasonably stated, the thrust of the oral agreement concerning termination between the parties was unambiguously that of a contract for the sale of goods did not constitute a contract independent of the parties' buyer/seller relationship.
The ranges to be purchased during the six months' termination period were all part of one transaction period. Consequently, the separate prices of the ranges to be purchased may be aggregated for purposes of statute of frauds compliance. Corbin on Contracts, Vol. 2 § 475. It is clear that the ranges to be purchased in the six month termination period, if aggregated, would then total over Five Hundred Dollars ($500.00).
The statute of frauds provision governing contracts for the sale of goods, and hence the cause of action laid out in Count 1, is § 400.2-201 (RSMo 1978). That statute reads in relevant part:
(1) Except as otherwise provided in this section a contract for sale of goods for the price of Five Hundred Dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.
* * * * * *
(3) a contract which does not satisfy the requirements of sub-section (1) but which is valid in other respects is enforceable....
(c) with respect to goods for which payment has been made and accepted or which have been received and accepted. § 400.2-201 (RSMo 1978).
The six month oral contract in question neatly fits within the sweep of § (1). The contract was for the sale of goods priced at Five Hundred Dollars ($500.00) or more and was not written or signed.
Plaintiff argues the oral contract is not barred by § 400.2-201(1) because it fits within the § (3)(c) exception. But, as defendant points out "that sub-section is obviously not applicable here since the goods which are the subject of plaintiff's damage claim were not received or accepted. They weren't even made because no purchase order was ever given." (Defendant's reply memorandum in support of motion for summary judgment at 6). Plaintiff tendered no evidence to the contrary.
Plaintiff also seeks to escape the effect of the statute of frauds by asserting that "Eagle Range, by its action in continually maintaining inventory at a level sufficient to provide products to Western Auto for a six month period, exhibited full performance of its obligations under the oral agreement, all in expectation that the other party would likewise perform." (Memorandum of Points and Authorities in Opposition to Defendant Western Auto's motion for summary judgment at 18). Yet, the evidence adduced shows plaintiff manufactured stoves for itself; it did not have an agency relationship with defendant. Moreover, plaintiff was attempting to rid itself of the Eagle either by sale or liquidation. See e.g., defendant's Exhibit NNN, page 4 to defendant's motion for summary judgment. While it is improbable that plaintiff's partial performance would satisfy the statute of frauds under the Uniform Commercial Code, that is of no moment here because there is a total lack of evidence to factually support plaintiff's partial performance argument.
The Court is aware of its duty upon consideration of a Rule 56 motion not to make decisions which ultimately reflect an opinion on the credibility or significance of all the evidence in the record. However, where the facts, such as in the case at bar, unambiguously establish the actualities of a situation as to leave no basis for dispute as *874 to their reality or as to the conclusion required then summary judgment is appropriate. Chenette v. Trustees of Iowa College, Grinnell, Iowa, 431 F.2d 49, 53 (8th Cir. 1970). Accordingly, the Court will enter summary judgment for defendant on Count 1 of plaintiff's complaint for plaintiff's claim is barred by the statute of frauds.
The Court parenthetically observes that the oral sales contract in question is also unenforceable for vagueness. No reason certain basis exists for fashioning a remedy for quantity and price standards. There is no evidence from which to discern damages and to permit the jury to speculate on the issue of damages would be a clear abuse by this Court.

COUNT TWO
The essential claim of plaintiff's second count is recovery for detrimental reliance predicated upon the legal theories of quantum meruit or quasi-contract. Defendant argues the second count is merely a recitation of the damage element of plaintiff's first count. Furthermore, defendant suggests the second count has been abandoned because plaintiff's damages are not specifically based on defendant's unjust enrichment.
The Court initially notes that plaintiff may plead alternative counts granted on contract and quantum meruit. Edmonds v. Stratton, 457 S.W.2d 228 (Mo. App.1970). Also, the statute of frauds does not dictate that the enrichment, if any, be left with the transferee (defendant) for requiring a return of the enrichment is not tantamount to enforcement of the contract. Nordstrom, Law of Sales § 29 at 73 (1970).
The Court can find no evidence in the record of any benefit from U.I.S. inuring to the benefit of Western Auto. A hearing on the record has not persuaded the Court otherwise. It is undisputed that all stoves ordered by Western Auto were paid for in full. Any excess stoves or unfinished inventory remained the property of U.I.S. and were sold upon Eagle's liquidation. Plaintiff has not shown that it suffered any detrimental reliance as a result of Western Auto's termination nor has plaintiff evinced any benefit flowing to the defendant. It is axiomatic that some unjust benefit accruing to the defendant, a resulting loss to plaintiff, must be shown to support recovery on a theory of unjust enrichment. The Court also observes that U.I.S. damage claim failed to list defendant's unjust enrichment and this obvious failure would appear to manifest an abandonment of the unjust enrichment theory by U.I.S. For these reasons the Court believes that summary judgment in favor of Western Auto is appropriate on Count 2.

COUNTS THREE AND FOUR
Plaintiff avers in Counts 3 and 4 that defendant falsely represented that it was satisfied with plaintiff's products and performance and that defendant would continue to honor its commitments under the contract. Part of the contractual commitment allegedly owed plaintiff by defendant was six months' notice of termination. It is further alleged that plaintiff reasonably relied upon these representations and forfeited potential new clients and accounts. Defendant argues Counts 3 and 4 are defective because plaintiff cannot prove defendant's fraudulent intent nor plaintiff's reasonable reliance on defendant's claimed assurances.
The classic elements of fraud in Missouri are (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) the hearer's consequent and proximate damage. Slater v. KFC Corp., 621 F.2d 932, 936 (8th Cir. 1980); Yerington v. Riss, 374 S.W.2d 52 (Mo.1964). Since the substance of fraud is the misrepresentation of an existing fact, the burden is on the movant, plaintiff, to demonstrate a current intent by the promissor at the time or at the time of the agreement not to perform. Ogilvie v. Fotomat Corp., 641 F.2d 581 (8th Cir. *875 1981); Brennaman v. Andes & Roberts Const. Co., 506 S.W.2d 462, 465 (Mo.App. 1973). Subsequent failure of performance by the promissor is insufficient to verify such intent or shift the burden of proof. Dillard v. Earnhart, 457 S.W.2d 666, 670 (Mo.1970).
Defendant has quite correctly noted that plaintiff cannot predicate a claim of fraudulent intent on the testimony of plaintiff's own witnesses who were pre-1979 employees of defendant. Moreover, even if plaintiff could use these witnesses for this purpose, the record is devoid of any evidence which would show plaintiff's own witnesses possessed a current intent not to perform their alleged oral promises to give plaintiff six months prior notice of termination. Plaintiff's claim is also based upon the communications between plaintiff and Western Auto's new (post-July, 1979) employees, Anderson, McClusky, Berk, McFadden and Micek. These employees apparently inquired as to whether plaintiff would be interested in participating in a trade show or placing ads in defendant's advertising circular. Although defendant employees met with or talked to plaintiff numerous times in 1980, the subject of Western Auto's termination of Eagle was never mentioned.
The Court can find nothing actionable in the above events. Western Auto and Eagle were involved in a buyer/seller relationship. Western Auto owed Eagle no duty not to switch stove suppliers. Defendant cannot be liable for fraud just because it continued its business association with plaintiff through late 1979 and into early 1980. More importantly, plaintiff has not shown a single representation made by McClusky, Micek, McFadden, Berk or Anderson or anyone else employed by Western Auto after July, 1979, which in any way referred to any six month notice agreement. Furthermore, it is undisputed that none of the post-July, 1979 Western Auto employees knew of the purported oral agreement until the outset of this lawsuit. Nor can the prior knowledge of Lamb and others be imputed under any agency principle to the post-July, 1979 Western Auto employees. In short, plaintiff has not presented any evidence or any inferences to be drawn from that evidence which would raise a genuine issue of material fact concerning defendant's fraudulent intent.
The Court is also of the opinion that plaintiff cannot prove that it had a right to rely on defendant's alleged assurances. Defendant offered three examples of defendant's conduct to demonstrate that a material factual question exists as to plaintiff's justifiable reliance. First, the alleged promises of former defendant employees, some of whom were fired, and all of which were not employed at Western Auto by late 1979. Plaintiff's representatives were privy to these assurances, not the post-1979 employees of Western Auto. Plaintiff knew that Western Auto in 1979 was embarking on a "new direction" by deemphasizing its appliance line, yet, plaintiff chose not to inquire into Western Auto's future plans. See Al Baltz' deposition at 75. Additionally, defendant had, for the last two years of its association with Eagle, purchased its stoves on a specific purchase order basis rather than the previous six months blanket purchase order method. Plaintiff's silence in the face of so many contrary signals, obviates any question that plaintiff could have justifiably relied upon the past assurances of former Western Auto employees. Second, two perfunctory business inquiries by defendant concerning plaintiff's participation in defendant's 1980 trade show and advertising circular. These inquiries are merely evidence that defendant continued to do business with Eagle and intended to do business until some point in 1980. They in no way relate to the oral six months notice termination agreement, nor do they constitute a basis for plaintiff's dependence upon defendant's compliance with the oral agreement. Finally, laudatory comments about Eagle's products contained in defendant's holiday greetings to plaintiff. The Court submits such proof as merely an artifice and is simply too flimsy a basis on which to ground a finding of genuine issue of material fact in a summary judgment motion.
*876 The Court further notes that plaintiff did not raise a genuine issue of fact as to its reliance. As the adduced evidence manifests, all plaintiff did, after the claimed assurances were given, was to produce and sell ranges to Western Auto pursuant to Western Auto's purchase orders. This plaintiff was contractually obligated to do. Plaintiff's protestations that it by-passed lucrative offers as a result of defendant's oral promise simply do not pass summary judgment muster. The evidence is uncontradicted that Eagle was looking to phase out its operations; not to expand into other areas. See the Spencer deposition, pps. 117-124. Indeed, Eagle probably would have phased or sold out to another had Eagle's financial picture been attractive enough to merit a favorable offer. There was no reliance by Eagle.

COUNT FIVE
Plaintiff claims in Count 5 that defendant has disparaged plaintiff's business reputation by recklessly, intentionally, or negligently consigning or transferring Eagle ranges to a third party who disposed of the ranges at far less than market value. Further, it is asserted that rumors resulting from defendant's actions made it difficult to sell Eagle ranges at other than distressed prices and eventually caused plaintiff to cease operations.
Defendant, as buyer of plaintiff's goods, is free to sell those items at a price less than market value. Defendant cannot be held responsible for the prices at which its consignee peddled the ranges. The Court can find no cognizable cause of action for the controverted facts alleged in Count 5. Therefore, defendant will be granted summary judgment as to Count 5.

COUNT SIX
Count 6 of plaintiff's amended complaint alleges defendant tortiously interfered with plaintiff's contractual obligations with third parties and plaintiff's reasonable business expectancies with third parties. As this Court has noted, to state claim for intentional interference with a contractual relationship, plaintiff must establish (1) the contract, (2) defendant's knowledge thereof, (3) its intentional interference causing its breach, and (4) the absence of justification, and damages resulting therefrom. Harber v. The Ohio National Life Insurance Co., 390 F.Supp. 678 (E.D. Mo.1974), aff'd 512 F.2d 170 (8th Cir. 1975). The Court finds the facts and their inferences, even taken in the light most favorable to plaintiff, fail to substantiate the second and fourth elements of a torturous interference cause of action. There is no proof that defendant possessed any knowledge of plaintiff's contractual relationships. Nor is there evidence establishing defendant was not justified in selling the ranges to a third party. Defendant had purchased the ranges from Eagle and was perfectly entitled to dispose of them at its price and on its conditions. Accordingly, defendant's motion for summary judgment as to Counts 1, 2, 3, 4, 5 and 6 be and is GRANTED.
NOTES
[1] Eagle year end June, 1979 losses amounted to $843,925. Losses for the first quarter of 1980 were $201,851.